Minute Order Form (06/97)

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | WILLIAM T. HART | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 01 C 4977 | DATE | MARCH 12 , 2003 |
| CASE TITLE | WILLIAM K. TRZECIAK v. VILLAGE OF LaGRANGE, etc., et al. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  Defendants' motion for summary judgment [23-1] is granted in part and denied in part. All claims are dismissed except the Title VII and § 1983 retaliation claims based on the alleged lowering of plaintiff's 1999 annual performance review. Status hearing is set for April 2, 2003 at 11:00 a.m.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required. | | 4 number of notices | | |
| ✓ | Notices mailed by judge's staff. | | MAR 13 2003 | | |
| | Notified counsel by telephone. | | date docketed | | 40 |
| | Docketing to mail notices. | | docketing deputy initials | | |
| | Mail AO 450 form. | | 3/12/03 | | |
| | Copy to judge/magistrate judge. | | date mailed notice | | |
| cw | courtroom deputy's initials | | mqm mailing initials | | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED

MAR 1 3 2003

WILLIAM K. TRZECIAK,                    )
                                        )
                    Plaintiff,          )
                                        )
          v.                            )     No. 01 C 4977
                                        )
VILLAGE OF LaGRANGE, an                 )
Illinois municipal corporation          )
and body politic, and                   )
LOREN CLARK,                            )
                                        )
                    Defendants.         )

## MEMORANDUM OPINION AND ORDER

Plaintiff William Trzeciak works in the Police Department
of defendant Village of LaGrange, Illinois.  Also named as a
defendant is Police Chief Loren Clark.  Plaintiff claims he
experienced retaliation because he provided too positive an
evaluation of an officer who had brought claims of sex
discrimination and also for testifying truthfully in a deposition
taken in that case.  Count I is a claim against the Village under
Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et
seq.  Count II is a constitutional claim against both defendants
under 42 U.S.C. § 1983.  Presently pending is defendants' motion
for summary judgment.

40

On a motion for summary judgment, the entire record is considered with all reasonable inferences drawn in favor of the nonmovant and all factual disputes resolved in favor of the nonmovant. Lesch v. Crown Cork & Seal Co., 282 F.3d 467, 471 (7th Cir. 2002); Hilt-Dyson v. City Of Chicago, 282 F.3d 456, 462 (7th Cir.), cert. denied, 123 S. Ct. 97 (2002); Schneiker v. Fortis Insurance Co., 200 F.3d 1055, 1057 (7th Cir. 2000). The burden of establishing a lack of any genuine issue of material fact rests on the movant. Outlaw v. Newkirk, 259 F.3d 833, 837 (7th Cir. 2001); Wollin v. Gondert, 192 F.3d 616, 621-22 (7th Cir. 1999). The nonmovant, however, must make a showing sufficient to establish any essential element for which he will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Billings v. Madison Metropolitan School District, 259 F.3d 807, 812 (7th Cir. 2001). The movant need not provide affidavits or deposition testimony showing the nonexistence of such essential elements. Celotex, 477 U.S. at 324. Also, it is not sufficient to show evidence of purportedly disputed facts if those facts are not plausible in light of the entire record. See NLFC, Inc. v. Devcom Mid-America, Inc., 45 F.3d 231, 236 (7th Cir.), cert. denied, 515 U.S. 1104 (1995); Covalt v. Carey Canada, Inc., 950 F.2d 481, 485 (7th Cir. 1991); Collins v. Associated Pathologists, Ltd., 844 F.2d 473, 476-77 (7th Cir.), cert. denied, 488 U.S. 852

(1988).  As the Seventh Circuit has summarized:

> The party moving for summary judgment
> carries the initial burden of production to
> identify "those portions of the pleadings,
> depositions, answers to interrogatories, and
> admissions on file, together with the affidavits,
> if any, which it believes demonstrate the absence
> of a genuine issue of material fact." Logan v.
> Commercial Union Ins. Co., 96 F.3d 971, 978 (7th
> Cir. 1996) (citing Celotex Corp. v. Catrett,
> 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d
> 265 (1986) (citation and internal quotation
> omitted)).  The moving party may discharge this
> burden by "'showing'--that is, pointing out to
> the district court--that there is an absence of
> evidence to support the nonmoving party's case."
> Celotex, 477 U.S. at 325, 106 S. Ct. 2548.  Once
> the moving party satisfies this burden, the
> nonmovant must "set forth specific facts showing
> that there is a genuine issue for trial."  Fed.
> R. Civ. P. 56(e).  "The nonmovant must do
> more, however, than demonstrate some factual
> disagreement between the parties; the issue
> must be 'material.'"  Logan, 96 F.3d at 978.
> "Irrelevant or unnecessary facts do not preclude
> summary judgment even when they are in dispute."
> Id. (citation omitted).  In determining whether
> the nonmovant has identified a "material"
> issue of fact for trial, we are guided by the
> applicable substantive law; "[o]nly disputes
> that could affect the outcome of the suit under
> governing law will properly preclude the entry of
> summary judgment."  McGinn v. Burlington Northern
> R.R. Co., 102 F.3d 295, 298 (7th Cir. 1996)
> (citation omitted).  Furthermore, a factual
> dispute is "genuine" for summary judgment
> purposes only when there is "sufficient evidence
> favoring the nonmoving party for a jury to return
> a verdict for that party." Anderson v. Liberty
> Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505,
> 91 L. Ed. 2d 202 (1986).  Hence, a "metaphysical
> doubt" regarding the existence of a genuine
> fact issue is not enough to stave off summary
> judgment, and "the nonmovant fails to demonstrate
> a genuine issue for trial 'where the record taken
> as a whole could not lead a rational trier of
> fact to find for the non-moving party . . . .'"

> Logan, 96 F.3d at 978 (quoting Matsushita Elec.
> Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S.
> 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538
> (1986)).

Outlaw, 259 F.3d at 837.

Resolving all genuine factual disputes and drawing all
reasonable inferences in plaintiff's favor, the facts assumed to
be true for purposes of summary judgment are as follows.  The
LaGrange Police Department ("LPD") consists of the Chief, three
lieutenants, five sergeants, and 19 patrol officers.  The LPD
prepares annual performance reviews which evaluate all
significant aspects of job performance, suggest areas for
improvement, and identify future performance goals.  As of 1999,
the ratings for each category were 1 to 4, with 4 being the best
rating.  The overall score on the performance review determines
the annual base salary increase for all non-union personnel.
Typically, a sergeant generates a draft review for each patrol
officer on his or her shift, which is then reviewed and possibly
revised by the shift's lieutenant, and finalized by the Chief.
Sergeant reviews typically are conducted by a supervising
lieutenant.  Lieutenants typically create their own initial
drafts, which are then reviewed, revised, and finalized by the
Chief.

The LPD's promotion process is distinct from the annual
review process.  Promotion decisions are solely within the

authority of the LaGrange Board of Fire and Police Commissioners ("BFPC"), which is an independent entity consisting of three residents appointed by the Village President. Historically, the BFPC has filled each vacancy by appointing the next candidate on the BFPC's eligibility list for that position. Every three years, the BFPC generates an eligibility list by ranking all candidates for the particular promotion. The ranking scores are based on (a) a written examination conducted by the BFPC, (b) an oral interview conducted by the BFPC, and (c) a merit and efficiency rating ("MER") determined by averaging the MER scores submitted for each candidate by each LPD supervisor ranked above that candidate. Points are also awarded based on seniority and military service.

MER's are generated separate from the annual performance reviews and are to be kept confidential, including from the person being rated. Clark states in his affidavit that, unlike performance reviews, MER's are to measure potential performance in the new position, not performance in the person's current position. However, the MER instructions contain no such direction. The general instructions are written in the present tense, referring to whether the candidate "demonstrates the particular characteristic." The "factors to consider" for each of the ten categories of characteristics are questions written in the present tense and refer to job performance that has occurred.

For example, one of the factors under self sufficiency is: "Does
this officer spend his/her time effectively performing his/her
work assignments?" On defendants' summary judgment motion, it
must be taken as true that, like a performance review, an MER is
based on the employee's performance in his or her current
position.

Plaintiff began working for the LPD in 1984. In 1996, he
was promoted to sergeant. In 1999, one of the lieutenant
positions became vacant. The prior lieutenant eligibility list
had expired and the BFPC had not yet undertaken the process of
generating a new list. Clark had the authority to temporarily
appoint an acting lieutenant. From May to October 1999,
plaintiff was an acting lieutenant. As stated in the memorandum
announcing the appointment, plaintiff was selected based on his
job performance and the ability to carry out the duties of the
position.[1] When the temporary lieutenant appointment expired,
plaintiff continued as a sergeant. On September 4, 2002, it was
announced that plaintiff would be appointed as a lieutenant
effective September 27, 2002.[2]

---

[1]Clark has testified otherwise, but, on defendants'
summary judgment motion, this factual dispute must be resolved in
plaintiff's favor.

[2]Plaintiff's answer to summary judgment was filed prior
to the announcement of this appointment and the stated effective
date was after defendants filed their reply. There is no
indication that the appointment did not go through.

In Fall 1999, the LPD conducted annual performance reviews for the year ended August 31, 1999. Plaintiff had to draft performance reviews for eight subordinates, including patrol officer Marge Kielczynski who had a Title VII and § 1983 sex discrimination and retaliation case pending as against the Village and Clark. See Kielczynski v. Village of LaGrange, Ill., 19 F. Supp. 2d 877 (N.D. Ill. 1998) (granting in part and denying in part motion to dismiss); Kielczynski v. Village of LaGrange, Ill., 122 F. Supp. 2d 932 (N.D. Ill. 2000) ("Kielczynski II") (denying motion for summary judgment). Plaintiff contends retaliation began immediately after he turned in his review of Kielczynski.

In accordance with instructions from Chief Clark, on Friday, October 8, 1999, plaintiff handed out his reviews to the officers that were present that day, including Kielczynski. On Monday October 11, plaintiff personally handed Clark all of the reviews plaintiff had written. At the time, discovery in Kielczynski's lawsuit was ongoing. Clark flipped through the reviews, immediately pulled out Kielczynski's, and reviewed it. Clark questioned the accuracy of plaintiff's review by stating, "Is she really this good?"[3] Plaintiff contends that Clark

---

[3]Defendants object that plaintiff's present affidavit to this effect should not be credited because it is inconsistent with plaintiff's prior deposition testimony. See Johnson v. Nordstrom, Inc., 260 F.3d 727, 736 (7th Cir. 2001), cert. denied, 535 U.S. 928 (2002) (quoting Patterson v. Chicago Association for

thereafter retaliated by downgrading defendant's MER rating and annual performance review. Plaintiff also contends that Lieutenant Patrick O'Connor aided Clark in that retaliation by also giving a negative MER and review.

O'Connor's MER for plaintiff is dated Monday, October 4, 1999, which is prior to Clark receiving plaintiff's performance review of Kielczynski. If O'Connor did indeed create the MER on that date, it could not have been motivated by retaliation since there is no contention that, prior to October 11, Clark or O'Connor had any reason to retaliate. Plaintiff contends there is evidence from which a reasonable trier of fact could conclude

---

Retarded Citizens, 150 F.3d 719, 720 (7th Cir. 1998)) ("an affidavit cannot be used to create a genuine issue of material fact where the affidavit differs from prior deposition testimony to the point that it is unreliable"). At his deposition, plaintiff testified as follows: "Q: Did you ever have another discussion with him about her evaluation? Did he ever express any disagreement with it or tell you anything about how he felt about that evaluation? A: No, we never-- after I gave it to him, he said he was going to hold on to it. And he said, you know, she's this good, or something like that. I said, yeah, I even had Bryan look at it. And that was the last time we discussed it, except he said he's going to hang on to it." Pl. Dep. I at 34. Contrary to defendants' contention, this testimony is consistent with the present affidavit. Plaintiff indicates Kielczynski's review was singled out. Further, "Is she really this good?" is "something like" "she's this good." The affidavit is not so inconsistent with the deposition testimony that it cannot possibly be credited. Defendant also points to plaintiff's deposition response of "gee, no" to the question of whether he had any "evidence" that his MER ratings were related to the evaluation of Kielczynski. Id. at 161. A layperson cannot be expected to respond to such a question with either a full understanding of the term evidence or the evidence available in his case. That question is not a basis for finding that a later affidavit contradicts deposition testimony.

that O'Connor did not turn in plaintiff's MER until after plaintiff's October 11 meeting with Clark.

It is undisputed that the MER prepared by O'Connor was delivered to Cathy Benjamin, secretary for the BFPC. Plaintiff contends Benjamin was on leave the entire week of October 4, thereby giving O'Connor the opportunity to revise the MER before Benjamin returned. In his affidavit, plaintiff states he tried to turn in the MER's he had written, but was told that Benjamin was on vacation that entire week. He does not state that he was actually at Benjamin's office on October 5 to observe she was not there. Plaintiff's statement about Benjamin being absent the entire week is therefore hearsay from unspecified sources. Benjamin, however, provides an affidavit stating that she was in the office the morning of October 5. Corroborating attendance sheets are also provided. Additionally, Benjamin provides a cover memorandum from O'Connor that is dated October 5 and was taped to a sealed envelope containing all the MER's he prepared. Benjamin, though, does not state that she received the envelope while at work the morning of October 5. For purposes of defendants' motion for summary judgment, it must be assumed that Benjamin did not find the envelope until she returned on Monday October 11. But even making this assumption, that still meant Benjamin had O'Connor's MER's on October 11. There is no evidence that plaintiff's October 11 meeting with Clark was

substantially earlier than Benjamin's arrival at work that day.
There is no basis for finding that an adequate opportunity
existed, following Clark's meeting with plaintiff, for Clark to
contact O'Connor, O'Connor to modify the MER on his computer, and
O'Connor to substitute a modified MER and reseal the envelope,
prior to Benjamin arriving at her office that day.  O'Connor's
1999 MER for plaintiff could not have been motivated by
retaliation.

Clark's MER for plaintiff is dated October 5.  There is
no evidence regarding when Clark actually provided this MER to
the BFPC.  However, there is also no contention by defendants
that Clark did not have an opportunity to create or modify the
MER after he met with plaintiff on October 11.[4]  For present
purposes, it must be assumed that Clark finalized plaintiff's MER
after the October 11 meeting between plaintiff and Clark.

O'Connor also created the final draft of plaintiff's
performance review, which was completed on October 12.  However,
it was prior to October 11 that Clark assigned O'Connor and
Lieutenant John Neuzil to prepare plaintiff's performance

------------------------------------------------

[4]In their opening brief, defendants raise no issue
regarding the timing of Clark's MER.  In their reply, defendants
dispute that Clark's MER was based on conduct of plaintiff that
occurred after October 5, but there is no express contention that
the MER itself was not completed or modified after October 5.
Since the issue is not raised by defendants, it will be assumed
that Clark completed or modified the MER on October 11 or
thereafter.

review.[5]  Clark discussed plaintiff's performance evaluation with
O'Connor, but not Neuzil.[6]  It was after plaintiff's October 11
meeting with Clark that O'Connor first told plaintiff that he was
doing plaintiff's performance review.  Also, O'Connor's initial
draft of plaintiff's performance review contained references to
performance reviews that plaintiff turned in to Clark on
October 11.  It is a reasonable inference that Clark and O'Connor
discussed plaintiff's performance review after the October 11
meeting and before the performance review was finalized and
signed by Clark on October 12.  Although Neuzil worked and
commented on an earlier draft of plaintiff's performance review,
O'Connor was the one who prepared the final draft for Clark's
signature.

It must be considered whether the evidence supports that
plaintiff's performance review of Kielczynski was such that Clark

---

[5]Plaintiff contends that this is contrary to the normal
procedure of having lieutenants prepare their own initial draft.
Plaintiff, though, was an acting lieutenant, not a regular
lieutenant.  In any event, no retaliatory motive can be inferred
from the action of assigning plaintiff's performance review to
O'Connor and Neuzil since the decision to assign it to them
occurred prior to October 11.  Also, plaintiff's contention that
selecting O'Connor to draft his performance review is also
evidence of retaliation is belied by the fact that O'Connor had
also drafted plaintiff's performance reviews from the immediately
preceding years.

[6]Clark testified that he did not recall Neuzil being
present, but was not sure if he was there or not.  On defendants'
summary judgment motion, it must be assumed that Neuzil was not
present.

would have been motivated to retaliate.[7]  It also must be
considered whether the evidence supports that Clark's 1999 MER of
plaintiff and the 1999 performance review of plaintiff were
motivated by retaliation and, if so, if either had a material
adverse effect on plaintiff.

Defendants contend the performance review of Kielczynski
could not have motivated any retaliation because it was not a
very good review.  There is no dispute that the Kielczynski case
was being actively litigated as of October 1999.  Also, evidence
supports that Clark actually engaged in acts of discrimination
and retaliation against Kielczynski, both before and after
plaintiff's preparation of Kielczynski's 1999 performance
review.[8]  Evidence supports that there was a "pattern of
antagonism" toward Kielczynski.  See Kielczynski II, 122
F. Supp. 2d at 952 n.7.  Additionally, plaintiff's own affidavit
is sufficient to support that plaintiff believed Kielczynski was

---

[7]Plaintiff's deposition in the Kielczynski case was taken
in January 2000.  Since plaintiff points to no evidence of
retaliatory actions taken thereafter, the deposition testimony
could not have motivated any retaliatory acts.

[8]As defendants concede, plaintiff relies on the same
evidence that Kielczynski presented in opposing summary judgment
in her case.  As is discussed in detail in Kielczynski II, 122
F. Supp. 2d at 938-54, that evidence was sufficient to create a
genuine factual dispute that Kielczynski suffered discrimination
and retaliation.

experiencing discrimination[9] and that he consciously chose to
provide an accurate evaluation of Kielczynski rather than join in
the discriminatory conduct.

Defendants contend the performance review of Kielczynski
is "largely unremarkable," giving Kielczynski a "good" or "B"
rating in nine of ten categories and giving her the fourth
highest score of the five patrol officers plaintiff evaluated.
As plaintiff points out, however, this is an overall good
evaluation and is more favorable than performance reviews that
Kielczynski had received the previous three years.  The 1999
performance review also contained more favorable narrative
comments than the prior performance reviews.  As was noted in the
summary judgment ruling in the Kielczynski case, the ratings
plaintiff gave Kielczynski were "similar" to the ratings he gave
other patrol officers and the evaluation "praised her
productivity, cooperative attitude, and reliability."
Kielczynski II, 122 F. Supp. 2d at 942.  Moreover, when Clark
received the performance reviews prepared by plaintiff, Clark
immediately picked out Kielczynski's and questioned whether she
was "really this good."  Some evidence supports that plaintiff's
1999 performance review for Kielczynski was better than Clark

---

[9]Plaintiff's affidavit is admissible as evidence of his
subjective beliefs.  His mere opinions are not considered as
evidence that the discrimination actually occurred.

- 13 -

would have preferred and that Clark was not pleased with the review.

Plaintiff's overall score on his 1999 performance review was 77. This resulted in a 2.00% increase in pay compared to a 2.25% increase that he would have received had he scored 79.[10] O'Connor's initial draft of the performance review had the 77 overall score. Neuzil had then revised the draft to delete some negative comments and add a total of two points. Without further consulting Neuzil, O'Connor left in the two additional points, but reduced the "Employee Monitoring And Evaluation" category by one point. That resulted in an overall reduction of two points since that category is counted double in determining the overall score. This last change was made after plaintiff's October 11 meeting with Clark. Clark approved and signed O'Connor's final draft.

Plaintiff disagreed with the rating for "Quantity of Work, Initiative & Industry," contending the calculation that he did not meet ticket-writing standards fails to properly take into account the days he was not assigned to the street because of authorized absences, training, or other duties. Plaintiff also

------

[10]The difference between a 2.00% and a 2.25% increase was $135 per year. There is also a continuing effect in the following years in which further percentage increases would have been received. There is no evidence as to whether there would still be an effect once plaintiff was promoted to lieutenant in 2002.

disagreed with his rating for "Employee Monitoring And Evaluation."  On October 13, plaintiff timely submitted a written memorandum requesting to meet with Clark to discuss the ratings for these two sections.  Clark never responded.[11]

The possible ratings for "Quantity of Work, Initiative & Industry" were 1 ("little or no initiative"), 2 ("limited initiative"), 3 ("able worker"), and 4 ("progressive worker"). Plaintiff received a 2, with the comment being "This sergeant has to lead by example, during this period he wrote an average of 16 citations a month, which is lowest of the street Sergeants.  He averaged only 31 self-initiated activities and completed only one criminal investigation.  He had four misdemeanor and one felony arrests for the entire period.  Much more effort is needed in this area."

Plaintiff questions the reference to 16 citations per month; he does not challenge the other comments.  For the pertinent time period, LPD officers (including supervisors) were required to generate a certain number of traffic citations to meet standards.  During each 28-day work cycle, 0-18 citations is "below standards," 19-24 citations is "average standards," and 25

---

[11]Defendants provided the affidavit of Lieutenant Edward Lichner in which he states that he informed plaintiff that Clark authorized a meeting and that plaintiff declined to pursue the meeting.  Lichner does not state when this occurred.  In any event, on defendants' summary judgment motion, plaintiff's deposition testimony that there was no response to his request must be taken as true.

or more is "above standards."  The number is reduced by one for
each day of authorized absence or other duty.  In his October 13
memorandum, Plaintiff contends he actually averaged 19.9 per
month, which would satisfy the "average standards" requirement.
Plaintiff does not provide evidence to support the contention
that he had a "monthly average" of 19.9 citations.[12]  Plaintiff
does point to Clark's deposition testimony and an attached
exhibit that contains 9 of the 13 talley sheets for the year
covered by the 1999 performance review.[13]  Clark Dep. at 186-90 &
Exh. 15.  For those nine periods and taking into account
authorized absences, plaintiff was "average standards" six times
and was "below standards" three times.  Plaintiff generated 144
citations for an average of 16 citations per period.  However,
taking into account his 28 authorized absences during those nine
time periods, minimally reaching "average standards" would have
required 143 citations (171 minus 28).  Overall, plaintiff was on
the low end of "average standards" since he issued 144 citations,
one more than the overall minimum for those nine periods.

_____

[12]As defendants point out, it is incorrect to consider a
"monthly" average.  The citations standard is based on a 28-day
period.  There are 13 28-day periods in a year, not 12 as with
months.  However, since plaintiff does not provide the underlying
data, it is unclear how he calculated the 19.9 figure.

[13]A tenth talley sheet (for the period August 25 through
September 21, 1999) is also provided, but it falls outside the
annual review period that ended August 31, 1999.

On the evidence before the court, it cannot be found that O'Connor was incorrect in calculating 16 citations per month. However, it also cannot be found, based on averaging out the periods and taking into account absences, that overall plaintiff was below standards in issuing citations. It is undisputed that the comment and the 2 rating was on the performance review in O'Connor's initial draft. Neuzil did not disagree, though he did not examine the underlying citations data. Additionally, Clark's failure to meet with plaintiff to discuss this rating could have been motivated by retaliation. On the evidence before the court on defendants' summary judgment motion, it must be assumed that, had Clark met with plaintiff and not acted with a retaliatory motive, Clark would have agreed to modify the comment about averaging 16 citations per month, though he might have still included that plaintiff was "below standards" for at least three periods during the year. Nevertheless, plaintiff does not point to sufficient evidence from which it can be found that a nonretaliatory supervisor would have increased the rating in this category to 3. Even if plaintiff minimally satisfied the citations requirement, he does not challenge the other stated reasons for the 2 rating.

The other complaint about the 1999 performance review is receiving a 2 rating instead of a 3 rating for Employee Monitoring And Evaluation. A 2 rating is described as an

"inconsistent evaluator" and a 3 rating is described as a "good evaluator." O'Connor's comment is: "The sergeant must be sure to note all employee deficiencies as well as an employee's good points. Part of being a good supervisor is the balanced picture an employee should get from his evaluation. The Sergeant has not been able to do this up to this point in his supervisory career. Performance evaluations are given on a timely basis." On the final draft, O'Connor unilaterally reduced this rating from 3 to 2 without informing Neuzil. Evidence supports that at least some of the stated reasons for the 2 rating are inconsistent with facts. The statement that plaintiff had had these same problems up to that point in his career is inconsistent with prior performance reviews that were also drafted by O'Connor. In both 1997 and 1998, O'Connor rated plaintiff 3 ("good evaluator"), including a comment in the 1997 performance review that plaintiff was "not afraid to engage in negative employee comments." Also, defendants' explanation that O'Connor and Clark rated plaintiff lower in 1999 because there were higher expectations for an acting lieutenant than a sergeant is inconsistent with the comments that repeatedly refer to plaintiff as "Sergeant." On defendants' summary judgment motion, it must be assumed that plaintiff was actually entitled to a 3 rating in this category. It must also be assumed that Clark, had he acted without a retaliatory motive, would have agreed to revise this rating if he

had met with plaintiff to discuss it. Such a change would have increased plaintiff's overall score to 79 and would have entitled him to the 2.25% raise instead of 2.00%.[14]

The Final Promotional Eligibility Register for Police Lieutenant was issued approximately October 24, 1999 and was to be effective for three years. The published list reports overall scores, it does not show the underlying ratings and calculations that determined the final score. Plaintiff was ranked fourth of four candidates, with a score of 65.10. The other candidates scored 80.20, 80.00, and 74.40. The MER ratings used in determining the overall score remained confidential. Plaintiff was unable to learn of the MER ratings until obtained in discovery after the present lawsuit was filed. See Complaint ¶ 13(f). In response to summary judgment, plaintiff does not point to any evidence as to any knowledge or speculation he had, as of 1999, regarding Clark's or O'Connor's scoring on his MER's.

Plaintiff presently contends that, if not for retaliation, O'Connor and Clark would have scored him higher on the MER's and he would have ranked third on the list instead of fourth, resulting in a promotion in August 2001. The rankings of

---

[14]An overall score of 79 would still have been the lowest that year for the LPD's four sergeants. The other three sergeants had overall scores of 89, 89, and 85. Also, whether the overall score is 77 or 79, it would still be close to plaintiff's overall score of 78 on his 1998 performance review.

the third-ranked candidate and plaintiff were calculated as
follows.

|  |  |  |
|---|---|---|
| MER average | 74.67 | 53.67 |
| Written test | 71.00 | 69.00 |
| Oral Interview | 85.67 | 87.67 |
| Subtotal | 231.34 | 210.34 |
| (30% of subtotal) | 69.40 | 63.10 |
| Seniority | 5.00 | 2.00 |
| Military | 0.00 | 0.00 |
| Total | 74.40 | 65.10 |

Although not taken into account at the time, plaintiff
was entitled to claim 3.5 military points.  The only part of the
total score that plaintiff contends was affected by retaliation
was the MER average, which was based on MER's prepared by Clark
(55), O'Connor (25), and Neuzil (81).  Plaintiff does not contend
that Neuzil acted with retaliation.  As previously discussed,
O'Connor completed his MER of plaintiff before October 11.
Therefore, O'Connor's MER scoring could not have been affected by
retaliation.  Even if it is assumed that Clark would have scored
plaintiff a perfect 100 absent any retaliatory motive,
plaintiff's MER average would be 68.67 (206/3).  Plaintiff's
total score would then be calculated as follows:

|  |  |
|---|---|
| MER average | 68.67 |
| Written test | 69.00 |
| Oral Interview | 87.67 |
| Subtotal | 225.34 |
| (30% of subtotal) | 67.60 |
| Seniority | 2.00 |
| Military | 3.50 |
| Total | 73.10 |

Thus, even assuming a perfect rating from Clark and the 3.5 military points, plaintiff would not have outscored the third-ranked candidate. Therefore, even assuming Clark retaliated by scoring plaintiff low on his MER, there was no possible impact on plaintiff's ranking on the 1999 promotional eligibility register.

As to whether Clark intentionally scored plaintiff lower than plaintiff deserved, the evidence is mixed. The MER form allows for a short comment at the end, but it primarily consists of numerical rankings of 0 to 10 in ten categories. Clark scored plaintiff 55 and added the comment: "Bill has done a good job in the sergeants position. However, Bill is not ready for advancement to the position of lieutenant at this time."

Plaintiff makes much of the fact that, on plaintiff's 1996 MER, Clark gave him a score of 76. That, however, was a rating for promotion to sergeant. Plaintiff had been a patrol officer for approximately 12 years at the time. When being considered for lieutenant, he had been a sergeant for approximately three years. Plaintiff compares Neuzil, though, who rated plaintiff 56 on the 1996 MER, but 81 in 1999. On the other hand, however, O'Connor rated plaintiff 77 in 1996 and dropped him to 25 in 1999. Also, although there is no strict correlation between the annual performance review and MER, some categories are similar. Nevertheless, on the MER, Clark rated plaintiff comparatively lower in a number of the similar

categories.  Clark explains that, in completing the MER, he
considered plaintiff's potential abilities as a lieutenant.
Although consistent with his comment on the MER, that explanation
is inconsistent with the instructions for the MER.  Additionally,
Clark's low rating on the MER is inconsistent with the stated
reasons for temporarily appointing plaintiff as a lieutenant.
Although a reasonable finder of fact could find either way, on
defendants' motion for summary judgment, it must be assumed that
Clark's MER rating was not reflective of plaintiff's actual
qualifications.

In a recent decision, the Seventh Circuit established a
new framework for analyzing retaliation claims on a motion for
summary judgment.  See Stone v. City of Indianapolis Public
Utilities Division, 281 F.3d 640 (7th Cir.), cert. denied., 123
S. Ct. 79 (2002).  That case states that there "should" be "two
(and only two) distinct routes" for a plaintiff on a motion for
summary judgment.  Id. at 644.  The first, "the more
straightforward, . . . is to present direct evidence (evidence
that establishes without resort to inference from circumstantial
evidence) that he engaged in protected activity (filing a charge
of discrimination) and as a result suffered the adverse
employment action of which he complains. . . .  The second route
to summary judgment, the adaptation of McDonnell Douglas to the
retaliation context, requires the plaintiff to show that after

- 22 -

filing the charge only he, and not any similarly situated
employee who did not file a charge, was subjected to an adverse
employment action even though he was performing his job in a
satisfactory manner." Id. Unlike the direct evidence approach,
the indirect method does not require any evidence of a causal
link between the protected activity and adverse action. Stone
eliminated a possible distinction between the direct and indirect
methods whereby the former required proof of but-for causation,
while the latter only involved a lower standard of proof of a
causal link, that the protected activity and adverse action "were
not wholly unrelated." See id. at 642-44.

Plaintiff contends he is relying on the direct evidence
approach.[15] Plaintiff contends that he has presented sufficient
evidence that (a) he engaged in protected activity, (b) he
suffered adverse actions, and (c) a causal relation exists
between the two. As to the last element, plaintiff primarily
relies on the close temporal proximity between his conduct and
the adverse action. The problem with plaintiff's purported
reliance on the direct evidence approach is that he is relying on
circumstantial evidence. Stone, 281 F.3d at 644, explicitly

---

[15]Plaintiff does not satisfy the indirect method prima
facie case set forth in Stone because he does not present
evidence of similarly situated employees who did not engage in
protected activity. See Rogers v. City of Chicago, ___ F.3d ___,
2003 WL 483202 *6 (7th Cir. Feb. 26, 2003).

states that direct evidence does not include circumstantial

evidence.   The Seventh Circuit has described direct evidence as

> evidence which if believed by the trier of fact,
> will prove the particular fact in question
> without reliance on inference or presumption.
> If the evidence consists of isolated statements,
> those statements should be causally related to
> the . . . decision making process, for direct
> evidence relate[s] to the motivation of the
> decisionmaker responsible for the contested
> decision.   Remarks and other evidence that
> reflect a propensity by the decisionmaker to
> evaluate employees based on illegal criteria
> will suffice as direct evidence of discrimination
> even if the evidence stops short of a virtual
> admission of illegality.

Walker v. Glickman, 241 F.3d 884, 888 (7th Cir. 2001) (quoting

Miller v. Borden, Inc., 168 F.3d 308, 312 (7th Cir. 1999)).

Accord Clanton v. Kirk & Blum Manufacturing Co., 2002 WL 31761363

*8 (S.D. Ind. Dec. 6, 2002).   See also Sanghvi v. St. Catherine's

Hospital, Inc., 258 F.3d 570, 574 (7th Cir.), cert. denied, 534

U.S. 1114 (2002); Radue v. Kimberly Clark Corp., 219 F.3d 612,

616 (7th Cir. 2000); Shannon v. Sheahan, 2003 WL 366584 *10 (N.D.

Ill. Feb. 18, 2003).   Temporal proximity as proof of a causal

relationship is generally considered to be circumstantial, not

direct, evidence.   See Bilow v. Much Shelist Freed Denenberg

Ament & Rubenstein, P.C., 277 F.3d 882, 895 (7th Cir. 2001)

(quoting Sauzek v. Exxon Coal USA, Inc., 202 F.3d 913, 918 (7th

Cir. 2000)); Hunt-Golliday v. Metropolitan Water Reclamation

District of Greater Chicago, 104 F.3d 1004, 1014 (7th Cir. 1997);

McKay v. Town & Country Cadillac, Inc., 2002 WL 664024 *23 (N.D. Ill. April 23, 2002); Horwitz v. City of Chicago, 2002 WL 1777050 *7 (N.D. Ill. Aug. 1, 2002); Medina v. City of East Chicago, Indiana, 184 F. Supp. 2d 805, 819-20 (N.D. Ind. 2001). But see Hamm v. Weyauwega Milk Products, Inc., 199 F. Supp. 2d 878, 897 (E.D. Wis. 2002); Matheny v. Reid Hospital & Health Care Services, Inc., 2002 WL 655702 *9 (S.D. Ind. March 12, 2002). Stone, though, apparently leaves open the possibility that temporal proximity may be considered under the direct evidence approach. See Stone, 281 F.3d at 644 ("The question of how much evidence the plaintiff must present to establish a triable issue that the adverse employment action of which he complains was retaliatory is not susceptible of a general answer. But we remind that mere temporal proximity between the filing of the charge of discrimination and the action alleged to have been taken in retaliation for that filing will rarely be sufficient in and of itself to create a triable issue."); McKay, 2002 WL 664024 at *23; Smith v. Allstate Insurance Corp., 2002 WL 485374 *16 (N.D. Ill. March 29, 2002). But even if the reliance on temporal evidence as proof of causation does not take plaintiff out of the direct evidence approach, he also does not present any direct evidence of Clark's (or even O'Connor's) retaliatory motive. Plaintiff does not have sufficient direct evidence as to any of his claims.

Although plaintiff does not make out a direct evidence case, the three elements that he claims to have shown state a standard formulation of the indirect method, prima facie case that predates Stone. See, e.g., McClendon v. Indiana Sugars, Inc., 108 F.3d 789, 796 (7th Cir. 1997); Dey v. Colt Construction & Development Co., 28 F.3d 1446, 1457 (7th Cir. 1994) (quoting Holland v. Jefferson National Life Insurance Co., 883 F.2d 1307, 1313 (7th Cir. 1989)). Even after Stone, a number of Seventh Circuit cases have relied on this formulation. See, e.g., Fine v. Ryan International Airlines, 305 F.3d 746, 752 (7th Cir. 2002); Franzoni v. Hartmarx Corp., 300 F.3d 767, 772-73 (7th Cir. 2002); Wells v. Unisource Worldwide, Inc., 289 F.3d 1001, 1008 (7th Cir. 2002). Although, following Stone, a plaintiff may not be required to provide proof of a causal link in order to satisfy the prima facie case, see Rogers v. City of Chicago, ___ F.3d ___, 2003 WL 483202 *6 (7th Cir. Feb. 26, 2003), a plaintiff is not necessarily precluded from attempting to make out the prima facie case by taking the more difficult approach of showing a causal link. In light of Stone, though, the plaintiff must make a showing of but-for causation, not the lesser "not wholly unrelated" standard. See Stone, 281 F.3d at 642-44; Wells, 289 F.3d at 1008.[16]

---

[16]Stone indicates that making a showing of but-for causation satisfies a plaintiff's entire proofs, not just the prima facie case. See Stone, 281 F.3d at 643. This need not be

Defendants contend plaintiff has not provided adequate proof of any of the three elements.  The first issue to consider is whether plaintiff has shown that he engaged in protected activity.  Protected activity under Title VII includes "opposition conduct," that is "oppos[ing] any practice made an unlawful employment practice."  42 U.S.C. § 2000e-3(a); McDonnell v. Cisneros, 84 F.3d 256, 262 (7th Cir. 1996).  This can include the passive conduct of declining to engage in discriminatory practices against other employees.  See id. Evidence supports that there was a pattern of discrimination against Kielczynski and that plaintiff believed she was being discriminated against.  Plaintiff declined to participate in that discrimination, instead choosing to score Kielczynski's annual performance review in a nondiscriminatory manner.  Plaintiff has shown that he engaged in protected activity under Title VII.

The § 1983 retaliation claim is different.  Plaintiff labels his § 1983 claim as an equal protection claim and refers to it as being "discrimination" based on the same facts as the Title VII retaliation claim.  Plaintiff does not contend that he was discriminated against because of his gender, race, or

---

resolved because plaintiff himself is not requesting summary judgment and defendants do not contend they have rebutted any prima facie case that has been shown.  But-for causation is also applicable to the § 1983 claim.  See Abrams v. Walker, 307 F.3d 650, 654 (7th Cir. 2002); Love v. City of Chicago Board of Education, 241 F.3d 564, 569 (7th Cir. 2001).  Compare Suppan v. Dadonna, 203 F.3d 228, 236 (3d Cir. 2000).

- 27 -

nationality. To the extent his claim is one for discrimination, it would be based on being discriminated against for being a person who opposed discrimination. Such a claim is more properly analyzed as a First Amendment retaliation claim. <u>See</u> <u>Vukadinovich v. Bartels</u>, 853 F.2d 1387, 1391-92 (7th Cir. 1988).[17] A public employee is not engaging in protected speech unless he or she is speaking out on a matter of public concern. <u>Horwitz v. Board of Education of Avoca School District No. 37</u>, 260 F.3d 602, 618 (7th Cir. 2001). In determining whether the speech at issue was on a matter of public concern, the content, form, context, and motivation of the speech must be considered. <u>Id.</u> It is well settled that internally complaining about discrimination against oneself is not speaking out on a matter of public concern. <u>Gray v. Lacke</u>, 885 F.2d 399, 411 (7th Cir. 1989), <u>cert. denied</u>, 494 U.S. 1029 (1990); <u>Yatvin v. Madison Metropolitan School District</u>, 840 F.2d 412, 419-20 (7th Cir. 1988); <u>Mata v. Illinois State Police</u>, 2001 WL 292804 *5 (N.D. Ill. March 22, 2001). On the other hand, speaking out as to

---

[17]Even if considered as an equal protection claim, defendants' actions would only be subject to strict scrutiny if the discrimination implicated a fundamental right such as First Amendment speech protections. <u>Martin v. Shawano-Gresham School District</u>, 295 F.3d 701, 712 (7th Cir.), <u>cert. denied</u>, 123 S. Ct. 601 (2002); <u>Zehner v. Trigg</u>, 133 F.3d 459, 463 (7th Cir. 1997). Thus, an equal protection claim based on the fundamental right of speech would still require that plaintiff show he engaged in protected speech in that he was speaking out on a matter of public concern. <u>See Vukadinovich</u>, 853 F.2d at 1392.

discrimination against others may be speech on a matter of public concern. See Marshall v. Allen, 984 F.2d 787, 794-96 (7th Cir. 1993); Tindal v. Montgomery County Commission, 32 F.3d 1535, 1539-40 (11th Cir. 1994); Kessel v. Cook County, 2001 WL 826914 *5 (N.D. Ill. July 12, 2001). Here, plaintiff was opposing discrimination against one other employee, not discrimination against himself. However, there is no evidence that plaintiff forthrightly expressed opposition to Clark's conduct. Plaintiff did not attempt to stop the discrimination other than to refuse to join in it. It is highly doubtful that plaintiff's completion of a nondiscriminatory evaluation constitutes speech on a matter of public concern that constitutes protected expression by a public employee.[18] However, since the parties have not expressly addressed this issue, it will be assumed that plaintiff's activity constituted protected speech for purposes of his constitutional claim.

The next issue to consider is whether plaintiff has made a sufficient showing of an adverse action. Although often referred to as the "adverse employment action" requirement, it is not a necessary element of a Title VII retaliation claim that the adverse action affect conditions of employment. Aviles v. Cornell Forge Co., 183 F.3d 598, 605-06 (7th Cir. 1999);

---

[18]Plaintiff was also deposed in the Kielczynski case, but that occurred at a later time and there is no present contention that any retaliation occurred after the deposition was given.

Gawley v. Indiana University, 276 F.3d 301, 314 (7th Cir. 2001).
See also Herrnreiter v. Chicago Housing Authority, 315 F.3d 742,
745-46 (7th Cir. 2002) (dictum).  However, there still must be
some form of materially adverse action.  Gawley, 276 F.3d at 314.
But compare Herrnreiter, 315 F.3d at 746 (suggesting in dictum
that the adverse action may not need to be as severe for a Title
VII retaliation claim as for a discrimination claim).  The
Seventh Circuit has repeatedly held that a negative evaluation or
recordation in an employee's file is not, by itself, a sufficient
adverse action to support a Title VII retaliation claim; there
must also be a materially adverse effect.  Gawley, 276 F.3d at
314-15; Ribando v. United Airlines, Inc., 200 F.3d 507, 511 (7th
Cir. 1999); Speer v. Rand McNally & Co., 123 F.3d 658, 664 (7th
Cir. 1997); Smart v. Ball State University, 89 F.3d 437, 442 (7th
Cir. 1996).  See also Silk v. City of Chicago, 194 F.3d 788,
802-03 (7th Cir. 1999) (Americans with Disabilities Act
retaliation claim).

As to the 1999 performance review, there is sufficient
evidence for the trier of fact to find that plaintiff was
affected by receiving a 2.00% raise instead of a 2.25% raise.
That represented a difference of $135.00 annually, plus
additional percentage increases in the following years.  The
Seventh Circuit has held that a one-time reimbursement of $156.89
is too low and sporadic to satisfy the materially adverse

requirement.  <u>Fyfe v. City of Fort Wayne</u>, 241 F.3d 597, 602-03
(7th Cir. 2001).  That case, however, expressly distinguished
one-time payments from raises.  The raise that plaintiff lost was
not discretionary; had he scored two more points on his
performance review he would have automatically received the
raise.  Also, it would have affected his salary for future years
as well, at least up until he was promoted to lieutenant in 2002.
In an alternative holding, and thus nonbinding <u>dictum</u>, the
Seventh Circuit has held that the denial of a raise of several
hundred dollars is sufficiently adverse to qualify as an adverse
employment action.  <u>See</u> <u>Power v. Summers</u>, 226 F.3d 815, 821 (7th
Cir. 2000).  <u>See also</u> <u>Kersting v. Wal-Mart Stores, Inc.</u>, 250 F.3d
1109, 1115-16 (7th Cir. 2001); <u>Boyd v. Illinois State Police</u>,
2001 WL 301150 *8 (N.D. Ill. March 28, 2001).  Because the
lowered score on plaintiff's 1999 performance review decreased
his raise, it constitutes an adverse action for purposes of his
Title VII retaliation claim.

The Title VII retaliation claim regarding the MER scores
and potential promotion to lieutenant, however, is different.  As
is discussed above, O'Connor's MER was turned in before plaintiff
engaged in protected activity and therefore could not have been
motivated by retaliation.  Clark's MER score, by itself, did not
affect plaintiff's ranking on the promotional eligibility list.
Since Clark's MER did not have a materially adverse effect on

plaintiff's promotion, it cannot support a Title VII retaliation claim. Plaintiff's Title VII claim based on the denial of a promotion will be dismissed.

A different adverse action standard applies to the § 1983 retaliation claims. For the § 1983 claims, there is no requirement of an adverse employment action. Power, 226 F.3d at 820. A necessary element, though, is that there be some form of retaliatory conduct that is sufficiently adverse to deter the exercise of an employee's First Amendment rights. Id. at 820-21; DeGuiseppe v. Village of Bellwood, 68 F.3d 187, 192 (7th Cir. 1995). Power holds that it cannot be found, as a matter of law, that the denial of a raise of a few hundred dollars is unlikely to deter speech. 226 F.3d at 821. There is no basis for holding that the lowered score on the 1999 performance review was not sufficiently adverse to deter plaintiff's exercise of his First Amendment rights.

The § 1983 retaliation claim based on the MER scores and denial of a promotion is different. The burden is on plaintiff to show that the action taken against him was sufficiently adverse. See id. at 820. Therefore, in response to a motion for summary judgment that raises an issue as to satisfying the adversity element, the burden was on plaintiff to provide evidence from which a jury could find that element. See Celotex, 477 U.S. at 317; Billings, 259 F.3d at 812. While the denial of

a promotion would likely satisfy that requirement, see Rutan v. Republican Party of Illinois, 497 U.S. 62, 72-75 (1990); Suppan v. Dadonna, 203 F.3d 228, 234, 236-37 (3d Cir. 2000), plaintiff was not actually denied a promotion because of the MER. However, at the time the MER was completed, it was not known that it would not actually affect plaintiff's ranking for a promotion. A supervisor's lowering of a promotion-related rating could deter the employee's exercise of speech if the rating had a potential of affecting the employee's chance to be promoted. See Suppan, 203 F.3d at 234-35. The problem with that theory, as applied to plaintiff's situation, is that the MER's were confidential. It is undisputed that plaintiff had no actual knowledge of the rating Clark had given him on the MER until after this lawsuit was filed. There is no contention that any retaliation was still occurring at that point. There is no basis in the record for finding that Clark's confidential scoring of plaintiff's 1999 MER was an action that was likely to deter plaintiff's exercise of his First Amendment rights. Therefore, the § 1983 retaliation claim based on the MER and denial of a promotion will be dismissed.

Any claim related to the denial of a promotion has been dismissed. The remaining claims are limited to retaliation in the form of plaintiff's lowered annual performance review. It still must be considered whether there is sufficient evidence of

a causal link between plaintiff's performance review of
Kielczynski and the lowered scoring on his annual performance
review. The evidence, viewed in the light most favorable to
plaintiff, is that Clark immediately pulled out the annual
performance review of Kielczynski and indicated to plaintiff that
he had rated her too high. Shortly thereafter, Clark informed
O'Connor about this meeting and O'Connor then revised plaintiff's
annual performance review downward and Clark approved it. That
downgrading occurred the same day as plaintiff's meeting with
Clark or, at the latest, the next day. Also, the downgrading was
done without informing Neuzil, who had worked on the prior drafts
of plaintiff's performance review. Additionally, two days after
October 11, plaintiff requested that Clark meet with him to
discuss the performance review and Clark failed to even respond
to the request. From this evidence, it can be inferred that the
downgrading was motivated by Clark's displeasure with plaintiff's
nondiscriminatory evaluation of Kielczynski. See McClendon, 108
F.3d at 796-97; Johnson v. Sullivan, 945 F.2d 976, 980 (7th Cir.
1991).

Plaintiff has shown that he engaged in protected activity
(a nondiscriminatory annual performance review of Kielczynski),
he was subjected to an adverse action (a lowered annual
performance review that resulted in a smaller raise), and a
causal connection between the two. The Title VII retaliation

claim against the Village based on this conduct will not be
dismissed.   Since the claim is based on Clark's personal
participation in the retaliation, the § 1983 retaliation claim
against Clark also will not be dismissed.  See Boyce v. Moore,
314 F.3d 884, 888 (7th Cir. 2002); Anderson v. Cornejo, 225
F. Supp. 2d 834, 859-60 (N.D. Ill. 2002); Kielczynski II, 122
F. Supp. 2d at 946, 953.  As to the Village's § 1983 liability,
it may be held liable if retaliation was performed by a person
with final policymaking authority for the Village.  See
Perkins v. Lawson, 312 F.3d 872, 875 (7th Cir. 2002); Vela v.
Village of Sauk Village, 218 F.3d 661, 665-66 (7th Cir. 2000).
The Village does not dispute that Clark is a policymaking
official of the Village.[19]  Cf. Kielczynski II, 122 F. Supp. 2d
at 953.  Therefore, the remaining § 1983 claim against the
Village also will not be dismissed.

    The only remaining claims are for retaliation that
allegedly resulted in approximately $135 of damages per year from
1999 until 2002.  Within two weeks the parties shall meet (in

---

[19]As regards the denial of a promotion, the Village
argues the BFPC is the policymaking body and that Clark is not a
member of that body.  As regards the annual performance review
that underlies the remaining § 1983 claim, there is no argument
that Clark is not a policymaking official with authority over the
performance review.  In defendants' statement of facts,
defendants state that the LPD "is administered by a military,
chain-of-command structure led by Chief Clark" and that annual
performance reviews are "finalized by the Police Chief."  Def.
Rule 56.1 Stmt. ¶¶ 2, 5.

person or by telephone) to discuss the possibility of settlement. At the next status hearing, the parties shall report on the possibility of settlement or alternative means of resolving the remaining claims in this case.

IT IS THEREFORE ORDERED that defendants' motion for summary judgment [23-1] is granted in part and denied in part. All claims are dismissed except the Title VII and § 1983 retaliation claims based on the alleged lowering of plaintiff's 1999 annual performance review.  Status hearing is set for April 2, 2003 at 11:00 a.m.

ENTER:

UNITED STATES DISTRICT JUDGE

DATED:  MARCH 12    , 2003

- 36 -